**The PEOPLE of the State of Colorado, Petitioner,**

v.

**John CERRONE, Respondent.**

**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Lawrence GOETZ, Respondent.**

**Nos. 91SC760, 92SC245.**

Supreme Court of Colorado,
En Banc.

June 7, 1993.

Rehearing Denied July 6, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Catherine P. Adkisson, Asst. Atty. Gen., Denver, for petitioners.

Neil MacFarlane, Westminster, for respondent in No. 91SC760.

David F. Vela, State Public Defender, James A. Henderson, Sp. Deputy Public Defender, Denver, for respondent in No. 92SC245.

Justice LOHR delivered the Opinion of the Court.

We granted certiorari in order to determine whether the Colorado Court of Appeals in *People v. Cerrone*, 829 P.2d 468 (Colo.App.1991), and *People v. Goetz*, No. 90CA0514 (Colo.App. Feb. 13, 1991), applied the proper legal standards in concluding under the Equal Protection Clause of the Fourteenth Amendment that there had been racial discrimination in the selection of the 1985–86 Colorado statewide grand jury ("1985–86 grand jury"). We hold that the legal standards applied in *Cerrone* and *Goetz* are partially incorrect and that the opposite result is reached when only the correct standards are applied. We therefore reverse the judgments of the court of appeals and remand with directions that it conduct further proceedings to resolve the other issues remaining in the cases.[1]

I

A

On March 12, 1986, the 1985–86 grand jury indicted John Cerrone and Lawrence Goetz ("defendants") in a single indictment which was filed in Jefferson County District Court.[2] Goetz moved to quash the indictment on the ground, among others, that the 1985–86 grand jury was illegally constituted in violation of his rights to equal protection. Thereafter, Cerrone filed a similar motion. On September 26 and October 30, 1986, the district court conducted hearings on the motions in which the defendants presented evidence of discrimination in the selection of the 1985–86 grand jury. On December 5, 1986, the district court issued a written order in which it found that the defendants had established a prima facie case of discrimination based on "race, national origin or economic status." On January 30, 1987, 'the district court conducted a hearing in which the prosecution attempted to rebut the defendants' prima facie showing of discrimination.

Evidence introduced at the September 26 and October 30, 1986, hearings established that Chief Judge Clifton A. Flowers of the Denver District Court ("Chief Judge Flowers" or the "chief judge") was the judicial officer in charge of selecting the 1985–86 grand jury. As a consequence, on January 30, 1987, the People called as witnesses on their behalf a deputy attorney general and one assistant attorney general who assisted

1. At trial, in addition to challenging the selection of the 1985–86 grand jury on the basis of alleged discrimination on account of race in violation of the Fourteenth Amendment, the defendants, John Cerrone and Lawrence Goetz, challenged it on the basis of alleged discrimination on account of race, national origin, and economic status in violation of § 13–71–103, 6A C.R.S. (1987) (repealed and reenacted in modified form as part of § 13–71–104, 6A C.R.S. (1992 Supp.)), which provided that "[a] citizen shall not be excluded from jury service in this state on account of race, ... national origin, or economic status." The trial court ruled that the manner of selecting the 1985–86 grand jury did not violate § 13–71–103, and both Cerrone and Goetz raised on appeal the issue of whether the selection process violated that statute. The court of appeals in *Cerrone* and *Goetz* did not reach any issue under § 13–71–103 because it found that the defendants' Fourteenth Amendment racial discrimination claim was dispositive. Nor did the court of appeals in these cases address any issue under the Colorado Constitution. *See Cerrone*, 829 P.2d at 470 ("It does not appear that defendant on appeal is asserting violations of protections afforded by the Colorado Constitution."); *Goetz*, slip op. at 2 ("The *Cerrone* ruling is dispositive here."). Consequently, on certiorari review, only the validity of the defendants' racial discrimination claim under the Fourteenth Amendment is before us, and we express no opinion under Colorado law on whether the criteria that were employed by the People in selecting the 1985–86 grand jury are otherwise appropriate.

On appeal to the court of appeals, Cerrone also raised four other issues, and Goetz raised one, that are unrelated to the grand jury selection process. The court of appeals found it unnecessary to address those issues because of its view that reversal was required as a result of racial discrimination in selection of members of the grand jury.

2. Cerrone was indicted on five counts of violating the Colorado Organized Crime Control Act, § 18–17–104, 8B C.R.S. (1986), one count of pimping, § 18–7–206, 8B C.R.S. (1986), and one count of pandering, § 18–7–203(1)(b), 8B C.R.S. (1986). Goetz was indicted on three counts of violating the Colorado Organized Crime Control Act, § 18–17–104, 8B C.R.S. (1986), one count of pimping, § 18–7–206, 8B C.R.S. (1986), and one count of pandering, § 18–7–203(1)(b), 8B C.R.S. (1986).

and advised the chief judge in selecting the 1985–86 grand jury, and two other assistant attorneys general who assisted Chief Judge Flowers in selecting statewide grand juries in other years. However, Chief Judge Flowers did not testify, and the trial court excluded an affidavit from him offered by the People on the ground that its admission would violate the defendants' rights under the Confrontation Clause of the Sixth Amendment.

Following testimony by the People's last witness on January 30, 1987, the trial court gave the defendants an opportunity to present additional evidence if they desired. The defendants declined to do so. After legal argument and a brief recess the trial court orally delivered its final decision on the issue. It found that during the course of selecting the 1985–86 grand jury, deliberate attempts were made to select persons with college educations or occupations that would help them to understand complicated cases that were to be presented that year to the grand jury and that deliberate attempts were also made to select persons whose jobs and family commitments would allow them most easily to be away from work or home nearly every Friday for one year when the grand jury met. The trial court ultimately found that "what happened in this case was not discrimination" against Spanish-surnamed people and therefore denied the defendants' motions to quash the indictment.[3]

Cerrone and Goetz were tried separately. Each was convicted on several counts of violating the Colorado Organized Crime Control Act and on one count of pandering.

Each pursued separately an appeal in the court of appeals, raising as one issue among others an alleged Fourteenth Amendment equal protection violation based on racial discrimination in the selection of the 1985–86 grand jury. A decision in Cerrone's appeal was issued first. A panel of the court of appeals held that "there was no evidence from which the trial court could conclude that the [defendant's] showing of discrimination had been rebutted." *Cerrone*, 829 P.2d at 472. The court reversed the judgment of conviction entered against Cerrone and remanded with directions to quash the indictment. *Id.* at 473. Several months later, a different panel of the court of appeals held in the Goetz appeal that because Cerrone and Goetz were indicted by the same grand jury in the same indictment, the equal protection claim raised on appeal by Goetz was identical to the claim decided in *Cerrone*. *See Goetz*, slip op. at 1–2. *Cerrone* was therefore dispositive, and the court in *Goetz* reversed the judgment of conviction entered against Goetz and remanded with directions to quash the indictment. *Id.*, slip op. at 2.

### B

The selection of the 1985–86 grand jury was initiated on January 28, 1985, when the Attorney General petitioned the chief judge for an order empaneling a state grand jury.[4] Chief Judge Flowers granted the petition and ordered that the 1985–86 grand jury consist of twelve jurors to be selected from the counties of Denver,

3. More specifically, the trial court found that there was no discrimination against Spanish-surnamed people in violation of the United States Constitution or the Colorado Constitution and that there was no unlawful exclusion of potential grand jurors on account of economic status, race, or national origin in violation of § 13–71–103, 6A C.R.S. (1987). We emphasize again, *see supra* note 1, that the only issue before this court is whether the court of appeals applied the proper legal standards in concluding under the Equal Protection Clause of the Fourteenth Amendment that there had been racial discrimination in the selection of the 1985–86 grand jury. No issue under the Colorado Constitution or § 13–71–103, 6A C.R.S. (1987), is

presented for review. In particular, we express no opinion on whether the application of the selection criteria assertedly employed—specifically, level of formal education, ability to be away from jobs and family, and status as a salaried employee rather than hourly wage earner, *see infra* pp. 190–191—constituted discrimination on account of race, national origin, or economic status under § 13–71–103 or is consistent with the Colorado Constitution.

4. The facts stated in this part of the opinion are derived from undisputed findings of the trial court and uncontroverted evidence in the record.

Adams, Arapahoe, Boulder, and Jefferson.[5] The State Court Administrator's office thereupon compiled a list of 375 prospective grand jurors, 75 from each of the five counties specified by the chief judge.[6] Each of the 375 prospective grand jurors was mailed a summons to appear in court on March 15, 1985, and each was mailed a "Juror Selection Questionnaire" that he or she was instructed to fill out and to return to the court immediately. The questionnaire asked for information regarding the prospective juror, including date of birth, present home address, present and past employment, educational background, record of criminal convictions, and prior participation in other judicial proceedings. The questionnaire asked about the age and occupation of immediate family members living with the prospective juror and whether the prospective juror had close friends or relatives practicing criminal law or employed in law enforcement work. Additionally, the questionnaire stated: "The Grand Jury generally meets one full day per week for a year. Allowances will be made for vacations, illnesses, and essential business trips. Do you have any problems, including health problems, that would interfere with your serving on the Grand Jury? Yes __ No __ If yes, please describe." The

questionnaire did not inquire about the race or national origin of the prospective juror.

Most of the 375 questionnaires were returned to the court during February and in early March. Based on answers to the questionnaires and with advice from Deputy Attorney General Gregory G. Smith and several assistant attorneys general, the chief judge settled on a list of 41 prospective jurors whom he required to appear in court on March 15, 1985, for a day of oral voir dire at the close of which the 12-member 1985–86 grand jury was to be empaneled. Those persons who returned questionnaires to the court but who were not chosen to appear for voir dire on the empanelment date received letters from the court notifying them that they were no longer required to appear in court on March 15. A small number of prospective jurors who failed to return their questionnaires also were present in court on March 15. The chief judge asked each of them to fill out a questionnaire at that time and subsequently excused all but one of them. This meant that the original pool of 375 prospective jurors had been narrowed down to 42 for the purpose of oral voir dire and empanelment on March 15, 1985.

The defendants have not challenged and do not now challenge the manner in which the original pool of 375 prospective jurors

**5.** The process in Colorado for selecting a statewide grand jury is determined partly by statute and partly by those who are responsible under the statute for carrying out the selection process. According to statute, the process begins when the Attorney General "deems it to be in the public interest to convene a grand jury which has jurisdiction extending beyond the boundaries of any single county." § 13–73–101, 6A C.R.S. (1987). The Attorney General then "may petition the chief judge of any district court for an order [to empanel a statewide grand jury]." *Id.* "[F]or good cause shown," *id.*, the chief judge may grant the petition. *Id.* The State Court Administrator is thereupon directed

   [to] prepare a list of prospective state grand jurors drawn from existing jury lists of the several counties. In preparing the list of prospective state jurors, the state court administrator need not include names of jurors from every county within the state, but he may select jurors from counties near the county in which the chief judge requesting the list presides. The chief judge ... shall empanel the

state grand jury from the list compiled by the state court administrator. A state grand jury shall be composed of twelve or [upon motion of the district attorney and for good cause shown] twenty-three members ..., but not more than one-fourth of the members of the state grand jury shall be residents of any one county. The members of the state grand jury shall be selected by the chief judge with the advice of the attorney general and shall serve for one year following selection unless discharged sooner by the chief judge.
   § 13–73–103, 6A C.R.S. (1987).

**6.** Deputy Attorney General Gregory G. Smith testified on January 30, 1987, that he and the chief judge thought that the statewide grand jury selection statute could be interpreted as requiring that 75 persons be summoned from each county, and that such was in fact their interpretation. Deputy Attorney General Smith did not specify any particular provision as the basis for this interpretation, and because the legal basis for this interpretation was never an issue in this case we express no opinion on the matter.

was selected. Instead, the defendants' claim is that persons with Spanish surnames were unconstitutionally excluded from the venire of 42 prospective jurors chosen to appear for oral voir dire on the empanelment date.[7] The defendants established that no Spanish-surnamed persons were chosen for the venire.[8] In addition, there was testimony that indicated that the chief judge relied on a coded numbering system for recording on a prospective juror's questionnaire the reason for excluding that prospective juror from the venire. For example, if a questionnaire was marked with the number "12," it meant that there was a medical reason for excluding that prospective juror, while the number "8" meant that the prospective juror was excluded because he or she no longer resided in Colorado. Approximately 68 questionnaires were marked with the number "11," and this apparently meant that the person who returned that questionnaire was being excluded by the chief judge from the venire for some unspecified "other" reason. Of that group of 68, approximately 50 answered "No" to the question "Do you have any problems, including health problems, that would interfere with your serving on the Grand Jury?" Of this latter group of 50, the defendants originally claimed that 7 had Spanish surnames. Whether 7 is the correct number has been the subject of some dispute,[9] but all parties agree that at least 5[10] Spanish-surnamed individuals were included in this group of 50. Therefore, it appears from the record that at least 5 Spanish-surnamed individuals who said that they had no problems that would interfere with their serving on the 1985–86 grand jury were excluded by the chief judge from the venire for unspecified "other" reasons and that no Spanish-surnamed individual was chosen for the venire. It is the exclusion of these Spanish-surnamed individuals that is the basis of the defendants' claim that the manner of selecting the venire for the 1985–86 grand jury violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### C

In reversing the judgment of conviction entered against Cerrone and concluding that the defendants had demonstrated a denial of equal protection in the selection of the venire for the 1985–86 grand jury,

---

7. *Black's Law Dictionary* 857, 1556 (6th ed. 1990), defines "venire" as "[t]he group of citizens from whom a jury is chosen *in a given case*" (emphasis added) and a "jury panel" as "[t]he group of prospective jurors who are summoned to appear on a stated day and from which a grand jury or petit jury is chosen." This suggests, perhaps, that "venire" is more often used to denote a group of prospective petit jurors rather than a group of prospective grand jurors. Nevertheless, the United States Supreme Court has used the term "venire" to denote a group of prospective grand jurors, *see Castaneda v. Partida,* 430 U.S. 482, 496, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); *Whitus v. Georgia,* 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1966), and we shall do the same. Moreover, because what is in controversy in this case is the selection of the group of 42 who were chosen to appear for oral voir dire on the empanelment date, and not the selection of the original pool of 375, we shall refer to the group of 42 as "the venire" in this case.

8. *See supra* note 7.

9. The People argued on January 30, 1987, that 1 person included by the defendants as having a Spanish surname did not have a Spanish surname. The People did not argue that any of the remaining 6 names was not a Spanish surname. The trial court made no finding on this issue. On appeal, Goetz continued to assert that there were 7 persons with Spanish surnames in the relevant group, while Cerrone claimed that there were at least 6. Without explanation, the court of appeals stated that there were 5. *See Cerrone,* 829 P.2d at 472. Although not expressly conceding the issue, the defendants have not alleged on certiorari review that there were more than 5. Because the result in this case is identical whether there were 5, 6, or 7 persons with Spanish surnames excluded from the venire, we need not resolve the matter. We note also that the convention of the parties before us has been either to characterize the alleged exclusions from the venire as the exclusion of "Hispanic individuals with Spanish surnames," or to decline to speculate about the race of the excluded individuals and to argue instead about the unlawful exclusion of persons based upon their Spanish surnames. We elect to treat the issue in this case as whether there was racial discrimination in the selection of the venire by the exclusion of persons with Spanish surnames—the most inclusive formulation.

10. *See supra* note 9.

the court of appeals relied primarily on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a United States Supreme Court case involving the exercise of peremptory challenges by the State in the selection of a petit jury. *Cerrone,* 829 P.2d at 472–73; *see Batson,* 476 U.S. at 82, 106 S.Ct. at 1714. Applying *Batson,* the court of appeals began with the premise that the basic principles prohibiting exclusion of persons from participation in jury service on account of their race are essentially the same for grand juries and petit juries. *Cerrone,* 829 P.2d at 470; *see Batson,* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3. The court of appeals further explained that the defendants first had to produce evidence that established a prima facie case of racial discrimination. *Cerrone,* 829 P.2d at 471. According to the court, the defendants established a prima facie case by showing that members of a cognizable group, specifically, Spanish-surnamed individuals, were totally excluded from the venire in a selection process that provided an opportunity for racial discrimination if the State actors involved were of a mind to discriminate. *Id.* at 471–72. The court specifically held that the defendants did not have to show that they were members of the excluded group. *Id.* at 471 (citing *Powers v. Ohio,* 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). According to the court of appeals, the burden then shifted to the State to rebut the defendants' prima facie case by articulating a race-neutral explanation for the exclusion of the individuals in question. *Cerrone,* 829 P.2d at 471. Citing *Batson,* the court explained that the State cannot meet its burden with "mere general assertions that its officials did not discriminate or that they properly performed their official duties," *id.,* and that what is required at this stage is that the State "give a clear and reasonably specific explanation of legitimate reasons for excluding the prospective jurors." *Id.* In reviewing the record before it, the court of appeals observed that Chief Judge Flowers "did not testify at the [January 30, 1987,] hearing, and his affidavit was excluded." *Id.* at 472. The court then found that "the prosecution provided no specific explana-

tion of the reasons for excluding the Spanish-surnamed jurors." *Id.* at 472. As a consequence, the court of appeals concluded that "there was no evidence from which the trial court could conclude that the showing of discrimination had been rebutted." *Id.* Reversal of Cerrone's judgment of conviction followed from this conclusion.

## II

■ We begin our analysis by recognizing that many principles applicable to Fourteenth Amendment equal protection analysis of claims of racial discrimination in jury selection are well established. First, "[f]or more than a century, [the United States Supreme Court] consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2351, 120 L.Ed.2d 33 (1992) (petit jury case); *see, e.g., Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (both grand and petit jury racial discrimination at issue); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880) (same). As a result, a conviction obtained under an indictment by a grand jury tainted by such discrimination is invalid. *E.g., Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972); *Hernandez v. Texas,* 347 U.S. at 482, 74 S.Ct. at 672; *Strauder,* 100 U.S. at 312. Second, "[t]he basic principles prohibiting exclusion of persons from participation in jury service on account of their race 'are essentially the same for grand juries and for petit juries.'" *Batson,* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3 (quoting *Alexander,* 405 U.S. at 626 n. 3, 92 S.Ct. at 1223 n. 3). Third, although it is clearly a violation of the Equal Protection Clause for a state to exclude prospective jurors on account of race, state action that results in a discriminatory impact does not by itself violate the Equal Protection Clause unless the state acted with a discriminatory purpose, *Hernandez v. New York,* —— U.S. ——, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion); *id.* at ——, 111 S.Ct. at 1873 (O'Connor & Scalia, JJ., concurring);

*id.* at ——, 111 S.Ct. at 1875 (Stevens & Marshall, JJ., dissenting); *Batson,* 476 U.S. at 93, 106 S.Ct. at 1721. With regard to the issue of discriminatory purpose, "the party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion." *Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1722 n. 18; *accord id.* at 93, 106 S.Ct. at 1721 ("As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'") (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)). Fourth, "Spanish-surnamed persons clearly constitute a cognizable group under … equal protection … analys[i]s." *Fields v. People,* 732 P.2d 1145, 1153 (Colo.1987);[11] *see Hernandez v. Texas,* 347 U.S. at 477–78, 74 S.Ct. at 746–47. Fifth, a defendant in a criminal case may successfully challenge the race-based exclusion of jurors from a grand or petit jury under the Equal Protection Clause whether or not the defendant and excluded jurors share the same race. *Powers v. Ohio,* 499 U.S. at ——, ——, 111 S.Ct. at 1366, 1369.

■ We further recognize that *Batson* outlines a three-step process for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause. *See Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1865–66 (plurality opinion); *Batson,* 476 U.S. at 93–98, 106 S.Ct.

at 1721–24. In that process, the defendant is required first to make a prima facie showing that the State has excluded potential jurors on account of race. Then, if the requisite showing has been made, the burden shifts to the State to articulate a race-neutral explanation for excluding the jurors in question. Third, if the State succeeds in articulating a race-neutral explanation, then the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *See Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1866.

In light of *Batson.*'s three-step process, we address three issues in determining whether the court of appeals applied the correct legal standards in *Cerrone* and *Goetz.* The first is whether the defendants established a prima facie case of discrimination without presenting evidence of a historical pattern of discrimination, or whether, as the People argue, *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965),[12] is controlling and leads to the result that the defendants failed as a matter of law to establish a prima facie case because they failed to present evidence of a historical pattern of discrimination. *See infra* part IIA. The second is whether the People articulated a race-neutral explanation for their actions. *See infra* part IIB. The third is whether the trial court erred in finding that there

**11.** *Batson* was issued by the United States Supreme Court shortly after *Fields* was briefed and argued. *Fields,* 732 P.2d at 1149–50. The issue in *Fields* was whether a defendant's rights to an impartial jury under the Sixth Amendment of the United States Constitution and Article II, Section 16, of the Colorado Constitution were violated. *Id.* at 1146. We held in *Fields* that "[a]lthough a defendant may establish a prima facie violation of this right solely on the basis of the use of peremptory challenges at the defendant's trial, here the transcript of the voir dire allows us to determine that the prosecutor's use of peremptory challenges to excuse three of the four Spanish-surnamed persons from the jury panel did not violate the defendant's right to an impartial jury." *Id.* Inasmuch as the case before us involves only a Fourteenth Amendment challenge to selection of a venire for a grand jury, the discussion of *Batson* in *Fields* is not directly relevant in this case.

**12.** In *Swain,* the Court held that a necessary element of a prima facie showing of purposeful discrimination in the exercise of peremptory challenges by the State is a showing by the defendant of "the prosecutor's systematic use of peremptory challenges against [members of the defendant's race] over a period of time." *Id.* at 227, 85 S.Ct. at 839. In *Batson,* the Court overruled *Swain* to the extent that *Swain* held that a defendant could not establish a prima facie case of purposeful discrimination under the Equal Protection Clause based solely on the prosecutor's exercise of peremptory challenges at the defendant's trial. *See Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2352–53, 120 L.Ed.2d 33 (1992); *Batson,* 476 U.S. at 96, 100 n. 25, 106 S.Ct. at 1722, 1725 n. 25.

was no purposeful discrimination in this case. *See infra* part IIC.[13]

### A

■ Notwithstanding the United States Supreme Court's express recognition that the basic principles prohibiting exclusion of persons from participation in jury service on account of their race are essentially the same for both grand and petit juries, *Batson,* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3, the People argue that *Swain,* 380 U.S. 202, 85 S.Ct. 824, rather than *Batson,* 476 U.S. 79, 106 S.Ct. 1712, is controlling because *Batson* applies only to issues concerning the selection of petit juries. More specifically, the People contend that in overruling *Swain*'s requirement of a showing of a historical pattern of discrimination in order to create a prima facie case of racial discrimination in selection of a petit jury, *Batson* left that requirement intact as applied to grand juries. We are not persuaded. While it is true that *Batson* is ultimately concerned with the "evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury," *id.* at 82, 106 S.Ct. at 1714–15, the express language and internal logic of *Batson* make it clear that *Batson* also provides detailed guidance on what constitutes a prima facie showing of purposeful discrimination in the selection of a venire for either a grand or petit jury.

The discussion in part IIIC of *Batson* of the evidentiary requirements of a prima facie showing of purposeful discrimination in the use of peremptory challenges in selection of a petit jury is preceded by a discussion in part IIIB of "[t]he showing necessary to establish a prima facie case of purposeful discrimination in selection of the venire." *Id.* at 94, 106 S.Ct. at 1722. That discussion in part IIIB begins with references to two post-*Swain* grand jury venire cases, specifically, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Alexander,* 405 U.S. 625, 92 S.Ct. 1221, and one pre-*Swain* grand jury venire case, specifically, *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667. *See Batson,* 476 U.S. at 94–95, 106 S.Ct. at 1721–1722. More precisely, the Court cites *Castaneda* and *Alexander* as illustrations of the general proposition that "[t]he showing necessary to establish a prima facie case of purposeful discrimination in selection of the venire may be discerned in this Court's decisions." *Id.* 476 U.S. at 94, 106 S.Ct. at 1722. Relying in part on *Castaneda* and *Hernandez,* the Court then explains that it is sufficient for a prima facie case for a defendant to prove that in the particular jurisdiction in question members of his or her race have not been summoned for a venire over an extended period of time and that the process makes it possible for the defendant's race to be singled out for differential treatment. *Id.* 476 U.S. at 94, 106 S.Ct. at 1721.[14] The Court does not at-

---

**13.** If the record shows that the State has offered a race-neutral explanation for its actions and if the trial court has ruled on the ultimate question of intentional discrimination, then the preliminary issue of whether the defendant made a prima facie showing becomes moot. *Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1866 (plurality opinion). We conclude in part IIB that the People did offer a race-neutral explanation, and in this case the trial court did rule on the ultimate issue that there was no purposeful discrimination. The People, however, have argued strenuously before this court that the defendants failed as a matter of law to make a prima facie showing because they failed to present evidence of a historical pattern of discrimination. Because of the importance of this issue and because it has been fully briefed, we elect to address whether the defendants made a prima

facie showing without presenting evidence of a historical pattern of discrimination.

**14.** In *Castaneda,* a Mexican–American defendant made a prima facie showing of discrimination in the selection of the venire for a grand jury on the bases of (1) statistical evidence that 79.1% of the population of the jurisdiction was Mexican–American, but over an 11–year period only 39% of the persons summoned for the venire were Mexican–American, and (2) the Texas system of selecting venires for grand juries reposed substantial discretion in jury commissioners, with the result that the selection system was susceptible of abuse by commissioners if they had a mind to discriminate. *Id.* 430 U.S. at 486–89, 494, 97 S.Ct. at 1275–77, 1280. In *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, a Mexican–American defendant made a prima facie showing of discrimination in the selection of

tempt in this discussion to distinguish between venires for grand and petit juries.

In the next and final two paragraphs of part IIIB, the Court considers how a "defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case."* *Id.* at 95, 106 S.Ct. at 1722 (emphasis in original). In particular, the Court explains that it is also sufficient for a prima facie case for a defendant to prove that members of his race were substantially underrepresented on the single venire from which his jury was drawn, and that the venire was selected under a practice providing the opportunity for discrimination. *Id.* In so doing, the Court does not attempt to distinguish between the selection of the venire for a grand or a petit jury. Moreover, the authorities cited by the Court for this proposition include *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280, and *Alexander,* 405 U.S. at 629–31, 92 S.Ct. at 1224–26, both of which are grand jury venire cases, and *Whitus,* 385 U.S. at 552, 87 S.Ct. at 647, which involved both grand and petit jury venires. In addition, although it is arguable that *Castaneda* and *Whitus* are only indirect authority for this proposition, *Alexander* is clearly a case in which the Court was satisfied that a defendant established a prima facie case of purposeful discrimination in the selection of a grand jury venire without presenting evidence of a historical pattern of discrimination in the selection of venires other than the venire from which his grand jury was selected. *See Alexander,* 405 U.S. at 629–31, 92 S.Ct. at 1224–26.

The Court concludes its discussion in part IIIB of *Batson* by stating:

The venire of a grand jury in part by showing that although 6 or 7 percent of the freeholders on the tax rolls of the relevant county were persons of Mexican descent, no person with a

Thus, since the decision in *Swain,* this Court has recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case.* These decisions are in accordance with

the proposition ... that "a consistent pattern of official racial discrimination" is not "a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions." For evidentiary requirements to dictate that "several must suffer discrimination" before one could object, would be inconsistent with the promise of equal protection to all.

*Batson,* 476 U.S. at 95–96, 106 S.Ct. at 1722 (citations omitted) (emphasis in original).

Part IIIC of *Batson* then begins as follows:

The standards for assessing a prima facie case in the context of discriminatory selection of the venire have been fully articulated since *Swain.* See *Castaneda v. Partida, supra* [430 U.S.] at 494–495 [97 S.Ct. at 1280]; *Washington v. Davis,* 426 U.S. [229] at 241–242 [96 S.Ct. 2040 at 2048–2049, 48 L.Ed.2d 597 (1976)]; *Alexander v. Louisiana, supra* [405 U.S.] at 629–631 [92 S.Ct. at 1224–1226]. These principles support our conclusion that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.

*Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. This transition in *Batson* from part IIIB to part IIIC makes it clear that although *Batson* finally reaches the issue of racial discrimination in the use of peremptory challenges to select a petit jury, the discussion of that issue is predicated on a detailed discussion of racial discrimination in selection of venires. Moreover, in discussing racial discrimination in selection of venires the Court does not distinguish between grand and petit juries and relies heavily on grand jury venire cases as precedent. The

Mexican or Latin American name had served on a grand or petit jury commission or grand jury for the last 25 years. *Id.* at 476 n. 1, 480–81, 74 S.Ct. at 669 n. 1, 671–72.

internal logic of *Batson* is therefore to extend certain principles derived mostly from the law of grand jury venire selection to the issue of petit jury selection. This conclusion is reinforced by *Batson*'s express acknowledgment, previously noted, that "[t]he basic principles prohibiting exclusion of persons from participation in jury service on account of their race 'are essentially the same for grand juries and for petit juries.'" *Batson*, 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3 (quoting *Alexander*, 405 U.S. at 626 n. 3, 92 S.Ct. at 1223 n. 3).

■ In light of the express language and internal logic of *Batson*, we are convinced that the People's argument that *Batson* applies only to issues concerning the selection of petit juries is without merit. Instead, we believe that under *Batson* it is clear that a defendant may establish a prima facie case of purposeful discrimination in the selection of a venire for a grand jury without presenting any evidence of a historical pattern of discrimination in the selection of other venires.[15] Under *Batson*, all that is required is that the defendant show that (1) the venire in question was selected under a practice providing the opportunity for discrimination, (2) members of a cognizable racial group were substantially underrepresented on the venire, and (3) the defendant is a member of that underrepresented racial group. In addition, following *Powers*, a defendant no longer has to show that he is a member of the same racial group that was underrepresented on the venire.[16] Finally, in determining whether a defendant has made a prima facie showing of purposeful discrimination, the trial court must determine whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94, 106 S.Ct. at 1721. In so doing, the trial court should consider all relevant circumstances. *Id.* at 96–97, 106 S.Ct. at 1722–1723.

■ The record indicates that the defendants sought to establish a prima facie case of purposeful discrimination by showing two things. First, by presenting evidence of the manner in which the venire was selected, the defendants attempted to show that the selection process provided the opportunity for discrimination if the State were of a mind to discriminate. Here the defendants were successful because it is obvious that the manner of selecting the venire for the 1985–86 grand jury did provide the opportunity for the State to discriminate on the basis of Spanish surnames if it so desired. Second, through the use of statistical evidence, the defendants attempted to show that Spanish-surnamed individuals were substantially underrepresented on the venire. More specifically, the defendants established that no Spanish-surnamed person was on the venire, and they called as an expert witness a statistician who testified that it was extremely

---

15. The People also argue that the particular nature and function of statewide grand juries, as well as the unique process by which they are selected in this state, make reliance on *Batson* inappropriate. In particular, the People point out that grand juries are primarily investigative rather than deliberative bodies, and the People argue that the process is designed to select what they describe as "the best-qualified people available, without regard to race, sex, or any other suspect criteria" (emphasis deleted). We fail to see, however, how it follows from either of these premises that a defendant must show a historical pattern of abuse as part of his prima facie case. Moreover, we find nothing in *Batson* to suggest that the function of statewide grand juries, or the process by which they are selected in Colorado, makes it inappropriate to rely on *Batson* for guidance as to what constitutes a prima facie showing of racial discrimination in the selection of a grand jury venire.

16. This does not mean that the race of a defendant in a jury discrimination case is now necessarily irrelevant. Rather, as the Court in *Powers* points out, evidence of the racial identity of the parties involved may still serve an evidentiary function. *Powers*, 499 U.S. at ——, 111 S.Ct. at 1373–74. For example, "[r]acial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms." *Id.*

improbable that this was the result of a random selection. In other words, given that the total relevant population eligible to serve on the venire was 92 individuals (the 42 who were on the venire plus the 50 who were excluded for unspecified "other" reasons despite the fact that each answered on a questionnaire that he or she had no problems that would interfere with serving on the grand jury), and that 7 of those 92 individuals had Spanish surnames, the defendants established that if the 42 (out of 92) who were selected for the venire had been selected at random, it was highly improbable that no individual with a Spanish surname would have been selected.[17]

The use of statistical evidence in this context has expressly been recognized by the United States Supreme Court. *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280; *cf. Whitus*, 385 U.S. at 552 n. 2, 87 S.Ct. at 647 n. 2 (applying in dicta principles derived from Michael O. Finkelstein, *The Application of Statistical Decision Theory to the Jury Selection Cases*, 80 Harv.L.Rev. 338 (1966)). We note, however, that "[r]ejecting the hypothesis that veniremen were selected at random, with the probability of selecting a [minority individual] equal to the proportion of [that minority group] in the [relevant] population, does not in itself imply discrimination in the selection process." Finkelstein, *supra*, at 359. Thus, in this case, the defendants presented direct evidence that the venire was not randomly selected, but no direct evidence that the selection criterion actually employed was whether an individual had a Spanish surname, as opposed to some other criterion or criteria that, either coincidentally or otherwise, had a disparate impact on the Spanish-surnamed individuals in question. Nevertheless, defendants are entitled to rely on such evidence in establishing that a cognizable group has been substantially underrepresented on a venire.

To summarize, the defendants showed that the selection process provided the opportunity for discrimination, and they presented competent statistical evidence that members of a cognizable group were underrepresented on the venire. Furthermore, the People conceded during oral argument that if a showing of a historical pattern of discrimination is not a necessary element of the defendants' prima facie case, then the defendants did make a prima facie case. Consequently, we conclude that the trial court did not err in ruling that the defendants made a prima facie case of purposeful racial discrimination in the selection of the venire.

## B

Once a defendant makes a prima facie showing, the burden shifts to the State to articulate a race-neutral explanation for its actions. *Hernandez v. New York*, — U.S. at —, 111 S.Ct. at 1866 (plurality opinion); *id.*, — U.S. at —, 111 S.Ct. at 1874 (O'Connor & Scalia, JJ., concurring); *Batson*, 476 U.S. at 94, 97, 106 S.Ct. at 1721, 1723; *Alexander*, 405 U.S. at 631–32, 92 S.Ct. at 1225–26. "The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Batson*, 476 U.S. at 94, 106 S.Ct. at 1721. However, the State's explanation "need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723.

The facts and holding in *Hernandez v. New York*, — U.S. —, 111 S.Ct. 1859, shed additional light on what it means for the State to offer a "race-neutral explanation." A plurality of four in *Hernandez*

17. The defendants' expert testified at the hearing conducted on October 30, 1986. Prior to that hearing, the defendants simply told their expert that there were 7 Spanish-surnamed individuals in the relevant group of 50, and she based her calculations on that figure. As we noted earlier, the People later challenged the accuracy of that figure. *See supra* note 9. However, the People did not assert that challenge until the hearing conducted on January 30, 1987, which was well after the trial court had rendered its decision on whether the defendants had made a prima facie case. Thus, for the purpose of determining whether the defendants made a prima facie case, the trial court was entitled to accept the accuracy of the figures used by the defendants' expert. In reviewing the trial court's December 5, 1986, ruling that the defendants made a prima facie case, it is appropriate that we do the same.

explained that a race-neutral explanation is "an explanation based on something other than the race of the juror," and that "unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, —— U.S. at ——, 111 S.Ct. at 1866 (plurality opinion).[18] In *Hernandez v. New York*, the defendant alleged that the prosecutor engaged in purposeful discrimination when he exercised peremptory challenges to exclude Latino members from the jury. The explanation offered by the prosecutor, which six members of the court deemed to be race neutral, was that the people who were excluded were those who spoke both English and Spanish, and they were excluded because their particular responses during voir dire caused him to doubt their ability to defer to the official English translation of testimony during trial. *Id.* at ——, 111 S.Ct. at 1867. While six members of the Court acknowledged that this selection criterion may lead to more Latinos than others being excluded, *id.* at ——, 111 S.Ct. at 1867, 1874–75, this disparate impact did not mean that the explanation was not a race-neutral explanation. *Id.* The plurality did seem to acknowledge that the disparate impact of an asserted criterion is relevant in determining whether it is race neutral, *id.* at ——, 111 S.Ct. at 1867 (disparate impact "will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry"), but obviously the plurality did not think that there was any "discriminatory intent . . . inherent in the prosecutor's explanation." *Id.* at ——, 111 S.Ct. at 1866.[19]

■ At the hearing conducted on January 30, 1987, in this case, the People put forward an explanation for the exclusion of Spanish-surnamed persons from the venire. They explained that complicated issues and complex cases were to be brought before the 1985–86 grand jury, which was to meet all day every Friday for about 40 weeks of the year. According to the People, the chief judge therefore tried to select from the original random pool of 375 a venire of approximately 40 who were more highly educated, on the assumption that additional formal education would tend to help them understand the cases that would come before them. According to the People, the chief judge also tried to select persons with jobs and family commitments that would most easily allow them without hardship to be away from work or home nearly every Friday for one year, operating on the assumption that persons who work for hourly wages are more likely to lose pay when serving on a state grand jury than are salaried employees, with the result that serving on a state grand jury is often more of a hardship for hourly wage earners.[20] Finally, the People explained that the chief judge thought that the jury selection statutes could be interpreted as not permitting the consideration of more than 75 people from any one county, that as a result the chief judge routinely excluded from the venire persons who were summoned from addresses in one county but who had moved to a different county, and that this was the most likely explanation for the exclusion of two of the Spanish-surnamed individuals in question.

■ Under the standard set forth in *Hernandez v. New York*, the People succeeded in offering a race-neutral explanation. *See Hernandez v. New York*, —— U.S. at ——, ——, 111 S.Ct. at 1866–67, 1874. That is, although some of the selection criteria asserted by the People might have a disparate impact on Spanish-surnamed individuals, under the facts concerning the grand jury at· issue here and the standard set by *Hernandez*, there is no

18. Two other members of the Court thought that this was either a correct definition of a race-neutral explanation, or that the correct definition makes it easier to offer a race-neutral explanation. *See id.* —— U.S. at ——, 111 S.Ct. at 1874 (O'Connor & Scalia, JJ., concurring).

19. Three members of the Court did not think that the prosecutor succeeded in offering a race-neutral explanation. *Id.* at ——, 111 S.Ct. at 1875–77 (Stevens & Marshall, JJ., dissenting; Blackmun, J., dissenting).

20. We express no opinion on the appropriateness of these criteria under the Colorado Constitution or § 13–71–103, 6A C.R.S. (1987). *See supra* note 3.

racially discriminatory intent inherent in any of the People's asserted selection criteria. The mere fact that the State succeeds in offering a race-neutral explanation, however, does not mean that the defendants have not proved purposeful discrimination. Rather, it means that the defendants have not prevailed as a matter of law, and that the trial court must proceed to the third and final step of *Batson*'s three-step process.[21]

### C

In the third step of the *Batson* process, a trial court must determine as a matter of "historical fact," *Hernandez v. New York*, — U.S. at —, 111 S.Ct. at 1870 (plurality opinion), whether the defendant has established purposeful discrimination. *Id.; see id.* at —, 111 S.Ct. at 1873 (O'Connor & Scalia, JJ., concurring); *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724. Because the issue at this third step in the *Batson* process is a pure issue of fact, *Hernandez v. New York*, — U.S. at —, —, 111 S.Ct. at 1869, 1873, reviewing courts should give deference to the findings made by the trial court. *Id.* In determining whether the State actor intended to discriminate, or whether the State's race-neutral explanation should be believed, the trial court should look at all the relevant evidence, both direct and circumstantial, *id.* at —, 111 S.Ct. at 1868; *Batson*, 476 U.S. at 93, 106 S.Ct. at 1721,[22] and "[c]ircumstantial evidence of invidious intent may include proof of disproportionate impact,"

*Batson*, 476 U.S. at 93, 106 S.Ct. at 1721. Moreover, and as previously indicated, the burden is on the defendant to prove the existence of purposeful discrimination, *id.*, which is to say, the defendant carries the ultimate burden of persuasion at step three of the *Batson* process, *id.* at 94 n. 18, 106 S.Ct. at 1722 n. 18.

Before reviewing the record to determine whether the trial court erred in finding that there was no racial discrimination in this case, we observe that there is an important difference between a case like this and cases like *Hernandez v. New York* that involve alleged discrimination in the exercise of peremptory challenges during selection of a petit jury. That is, when a defendant contends that prosecutorial challenges are based on a constitutionally impermissible criterion shortly after the prosecution has exercised its peremptory challenges, the prosecutor can fairly be expected specifically to recall striking a certain person and the reason for doing so. In contrast, the record indicates that Chief Judge Flowers has over the course of several years excluded more than 1,000 persons from initial, randomly-selected pools of 375 prospective state grand jurors. Assuming for the sake of argument that the chief judge paid no attention to whether someone had a Spanish surname, it is unreasonable to expect that when challenged over one year later with regard to a particular name he would be able specifically to recall excluding the prospective juror. It was therefore

---

**21.** The court of appeals in *Goetz* interpreted *Cerrone* as concluding that the prosecution failed to provide a race-neutral explanation. *Goetz,* slip op. at 2. Language employed in *Cerrone* supports this interpretation, *see Cerrone,* 829 P.2d at 472, and such language further suggests that the court envisioned the race-neutrality step in *Batson* as an evidentiary burden placed on the State. *Id.* *Hernandez v. New York* and *Batson,* however, seem to suggest that the race-neutrality step does not necessarily require that the State produce any evidence, but only that it meet a purely legal requirement of articulating a race-neutral explanation for its actions. Because we are satisfied that the procedures employed by the trial court were adequate in this case, and because in practice it may be difficult to separate the offering of a race-neutral explanation from the offering of evidence in support of that explanation, we

think it unnecessary at this time to resolve whether the State must present evidence in support of its explanation at step two of the *Batson* three-step process after a defendant has made a prima facie showing of discrimination in the selection of a grand jury venire.

**22.** Relevant United States Supreme Court opinions do not prescribe particular procedures for presenting evidence and information relevant to the *Batson* three-step process. In this case, the trial court gave the defendants an opportunity to present new evidence after the People presented its evidence. We believe the procedure adopted by the trial court was within its discretion, and in any event the defendants must have the opportunity to challenge the credibility of whatever evidence the People present.

not incumbent upon the People to produce competent evidence that the chief judge specifically recalled eliminating any of the Spanish-surnamed persons in question.

The record before us indicates that the trial court was presented with circumstantial evidence from both sides regarding whether there was any purposeful racial discrimination in the selection of the venire. On the one hand, the defendants presented evidence that the total exclusion of Spanish-surnamed individuals from the venire was not the result of a random selection process, and that the relevant State actors had the opportunity to discriminate if they desired. It is also fair to say that the defendants produced very little, if any, evidence that such exclusion was racially motivated and not motivated by the race-neutral criteria asserted by the People.

On the other hand, the trial court heard testimony from Deputy Attorney General Smith, who worked closely with Chief Judge Flowers in the selection of the 1984–85, 1985–86, and 1986–87 state grand juries,[23] that he believed that the chief judge made "an effort ... to affirmatively put people from minority groups on the Grand Jury,"[24] and that in other years Chief Judge Flowers selected Spanish-surnamed persons to serve on the state grand jury. Deputy Attorney General Smith also explained that the exclusion by the chief judge of the particular Spanish-surnamed individuals from the venire was consistent with what he would have advised, or did advise, the chief judge[25] on the basis of the criteria already described, specifically, possible hardship in being away from work or family, formal education, and being summoned from a county in which the prospective juror no longer resides. In addition, Deputy Attorney General Smith testified that it has been his experience that although many people answer on their written questionnaires that they have no problems that would interfere with service on a grand jury, after such persons appear in court for oral voir dire, one-third to one-half of them change their minds and state that they do have reasons why they cannot serve on the grand jury. Therefore, according to Deputy Attorney General Smith, those who screen the questionnaires try to anticipate such occurrences and will recommend exclusion of a potential juror on the basis of a perceived possible hardship even if that person does not identify any specific hardship on the questionnaire. In addition to this testimony, the trial court received into evidence copies of the questionnaires sent to the court by those selected for the venire and by those in the group of 50 who were excluded from the venire for unspecified "other" reasons even though they said that they could serve on the 1985–86 grand jury. Included among them were copies of the questionnaires filled out by the Spanish-surnamed persons in question. The trial court was therefore in a position to test firsthand the plausibility of the People's explanations, and we note that the defendants' own expert testified that the venire was "significantly better educated than the persons that were in the ... group ... excluded from serving."[26] Thus the defen-

---

**23.** "The members of the state grand jury shall be selected by the chief judge *with the advice of the attorney general....*" § 13–73–103, 6A C.R.S. (1987) (emphasis added).

**24.** In addition, First Assistant Attorney General Garth Lucero, who assisted Chief Judge Flowers in selecting the 1985–86 grand jury, testified that "my recollection is that Judge Flowers was particularly sensitive to having a good cross-section of women, blacks and Hispanics," and First Assistant Attorney General Thomas P. McMahon, who assisted Judge Flowers in selecting grand juries in several other years, testified that "my observations are ... the Judge would make very positive affirmative efforts to include minority group members on the State Grand Jury."

**25.** Deputy Attorney General Smith testified that he had no independent or specific recollection of at least one of the individual questionnaires that became the focus of attention in this case, and the context suggests that he would have said that he had no independent recollection of any of the other questionnaires as well.

**26.** As previously indicated, in addition to challenging at trial the selection of the venire on the basis of alleged discrimination on account of race, the defendants challenged it on the basis of alleged discrimination on account of economic status in violation of § 13–71–103. *See supra* note 1. In connection with their economic status discrimination claim, the defendants argued that by looking for more highly educated people for the venire who were not hourly

dants' own expert tended to confirm the People's claim that it was educational status, and not Spanish surname, that led to the exclusion of at least some of the persons in question.

To summarize, the People presented (1) testimony from those familiar with the selection process that, as an objective matter,[27] certain relevant and race-neutral criteria were generally applied by the chief judge (2) testimony and evidence that the exclusion of the Spanish-surnamed persons from the venire was consistent with the application of those criteria, (3) testimony from those who worked closely with the chief judge that they believed that he affir-

matively tried to include minorities on grand juries, and (4) testimony that persons with Spanish surnames were included on other grand juries selected by Chief Judge Flowers. In addition, the trial court had before it copies of all of the relevant juror selection questionnaires. As a consequence, we disagree with the court of appeals' conclusion that there was no evidence produced from which the trial court could conclude that the defendants' prima facie showing of discrimination had been rebutted. Although the evidence was largely circumstantial, it was sufficient to support the trial court's finding.[28] Accordingly, we conclude that the trial court did

wage earners, the People were excluding potential jurors from the venire on account of their economic status because of the close statistical correlation between economic status and formal educational achievement and because hourly wage earners tend to earn less.

**27.** Discriminatory intent or purpose is not a purely subjective phenomenon, but has significant objective aspects. That is, just as it is true that "the 'discriminatory purpose' which characterizes violations of the Equal Protection Clause can sometimes be established by objective evidence that is consistent with a decisionmaker's honest belief that his motive was entirely benign," *Hernandez v. New York,* — U.S. at —, 111 S.Ct. at 1876 (Stevens, J., dissenting); *see Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), it is also true that a prima facie case of discrimination can sometimes be rebutted merely by objective evidence of what "actually happened rather than evidence describing the subjective state of mind of the actor," *Washington v. Davis,* 426 U.S. 229, 253, 96 S.Ct. 2040, 2053, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). Thus, while it is true that the People offered no competent evidence of what may have been the chief judge's purely subjective thought processes, it was not essential that they do so in light of the fact that the defendants presented at best only a weak prima facie case based on evidence that the selection process was not random and that the selection process was susceptible to abuse. In particular, it was not necessarily fatal to the People's case that they did not present evidence that the chief judge himself recalled employing certain general criteria when he screened the questionnaires, or that the chief judge did in his own mind employ such general criteria. Nevertheless, the preferred procedure in this case would have been for the chief judge to testify, and in different contexts the People would be expected to produce competent evidence of relevant subjective thought processes.

**28.** This evidence sharply contrasts in several respects with the lack of evidence presented in *Castaneda, see supra* note 14, in which the United States Supreme Court held that the State of Texas failed to rebut a prima facie showing of racial discrimination in the selection of a grand jury venire. *Castaneda,* 430 U.S. at 501, 97 S.Ct. at 1283. Specifically, in *Castaneda,* the State of Texas presented to the state and federal district courts no explanation at all for the underrepresentation of Mexican–Americans on the venire, *id.* at 488–89, 490–91, 97 S.Ct. at 1276–77, 1278; *see id.* at 516–17, 97 S.Ct. at 1291–92 (Powell, J., dissenting), in contrast to the People's explanation in this case based upon the criteria of formal education, possible hardship in being away from work or family, and county of current residence. In addition, since the State of Texas offered no explanation at all for the underrepresentation of Mexican–Americans on the venire, both the state and federal trial courts were unable to test the plausibility of such an explanation in light of what actually seemed to occur. In contrast, in this case, the trial court had before it the juror selection questionnaires filled out by those selected for the venire and by those excluded from the venire for unspecified "other" reasons. The trial court could therefore determine for itself whether education, work status, and county of current residence seemed to play any role in the selection process. Moreover, far from challenging the People's asserted explanations, the defendants in this case generally argued to the trial court that the People actually did employ selection criteria based upon formal education and work status but that such criteria violated a statutory prohibition against economic status discrimination in the selection of the venire. *See supra* notes 1, 3, 26. Finally, in *Castaneda,* there was a historical pattern of underrepresentation of Mexican–Americans among persons summoned for grand jury service. In this case, the defendants have not challenged the People's evidence that the chief judge selected Spanish-surnamed individuals to serve on other grand juries, nor have they

not err when it found as a matter of historical fact that the defendants did not sustain their burden of proving purposeful racial discrimination under the Fourteenth Amendment.[29]

### III

For the foregoing reasons, we reverse the judgments of the Colorado Court of Appeals. These cases are remanded to that court for further proceedings to address the defendants' remaining contentions not reached by the court of appeals in its earlier opinions.

SCOTT, J., dissents, and MULLARKEY, J., joins in the dissent.

VOLLACK, J., does not participate.

Justice SCOTT dissenting:

When called upon to examine claims of unlawful discrimination in our criminal justice system, it is convenient to presume that the actions of government officials are carried out with a benevolent intent. Nonetheless, the State should be held to the same evidentiary standards applied to the ordinary citizen and, therefore, must be required to present legally competent evidence to support its questioned practices. Because I believe vindication of all we hold dear occurs equally when the State comes forward with sufficient evidence to clear its

officials of claims of improper motive, as well as when its unlawful acts are corrected, I cannot subscribe to the holding of the majority.

I agree with the majority that the defendants in this case made a prima facie showing of purposeful racial discrimination in the selection of the venire. See maj. op. at 189. I also agree that, once the defendants had set out their prima facie showing, the burden shifted to the State to articulate a race-neutral explanation for its actions. Id. However, I am unable to reach the conclusion, as did the majority, that the State met its burden of offering a race-neutral explanation for the composition of the statewide grand jury by presenting "circumstantial evidence" which included no legally competent evidence from the selecting official. See maj. op. at 192 and 193. Because I believe that this case has been wrongly decided and that the court of appeals should be affirmed, I respectfully dissent.

### I.

#### A.

Over one hundred years ago, beginning with *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), the United States Supreme Court held that a defendant has a constitutional right to a jury selected by

---

alleged any historical pattern of underrepresentation. The trial court would therefore have been entitled to rely upon the inference that all things being equal, a chief judge who selected Spanish-surnamed individuals for other venires is less likely to have purposely excluded all Spanish-surnamed individuals from the venire in this case.

**29.** In describing *Batson*'s three-step process for evaluating equal protection claims, the court of appeals in *Cerrone* did not state that the ultimate burden of persuasion is on the defendant to prove purposeful discrimination or that reviewing courts are instructed to give deference to the findings of trial courts on whether there was purposeful discrimination. In addition, the court in *Cerrone* did not expressly indicate the legal premise or premises upon which it relied when it concluded that the People failed to rebut the defendants' prima facie case. It is therefore possible that the court in *Cerrone* misconceived the proper legal standards to apply by

misconceiving either the defendants' burden of proof or the proper standard for reviewing the trial court's findings or both. Language in *Cerrone* also suggests that the court may have incorrectly conceived the second step of the *Batson* process as placing on the People an evidentiary burden of persuasion. See *Cerrone*, 829 P.2d at 471 ("Once the defendant makes the requisite [prima facie] showing, [in the second step of *Batson* ] the burden shifts to the prosecution to explain adequately the racial exclusion. *The prosecution must demonstrate that permissible racially neutral selection criteria and procedures have produced the result.*" (emphasis added)). The court in *Cerrone* may have reached the result that it did because of any one or more of these legal errors, *cf. supra* note 21, but because we can only speculate about which, if any, was actually involved in the court's decision-making process, we hold simply that the legal standards applied directly in *Cerrone* and derivatively in *Goetz* are "partially incorrect." See *supra* p. 180.

nondiscriminatory criteria. At the same time, the Court concluded that denying a person participation in jury service on account of race is unconstitutional. *Id.* 100 U.S. at 308. *See also Batson v. Kentucky,* 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986) and *Powers v. Ohio,* 499 U.S. ——, ——, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991) ("[a]n individual juror ... does possess the right not to be excluded ... on account of race"); *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Georgia v. McCollum* —— U.S. ——, 112 S.Ct. 2348, 2353, 120 L.Ed.2d 33 (1992). More recently, the Court acknowledged that "the harm ... extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *McCollum,* —— U.S. at ——, 112 S.Ct. at 2353 (*citing Batson v. Kentucky,* 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986)).

Consistent with these principles and state constitutional requirements, our General Assembly has, through a comprehensive statutory scheme in place for over twenty years, adopted as the policy of our state "that all persons selected for jury service shall be selected at random from a fair cross section of the population." Section 13–71–102, 6A C.R.S. (1987);[1] *see also People v. Sepeda,* 196 Colo. 13, 20 n. 7, 581 P.2d 723, 728 (1978). This statutory scheme prohibits discrimination on several bases, including race and economics. Section 13–71–103, 6A C.R.S. (1987). Moreover, we have previously held that selection of jurors by means which exclude citizens based on race not only violates our statutes but defendants' rights under both our federal and state constitutions. *See e.g., Fields v. People,* 732 P.2d 1145 (Colo.1987) (Spanish surnamed jurors constituted a cognizable group for purpose of equal protection claims for exclusions from jury based on race); *Sepeda,* 196 Colo. at 19, 581 P.2d at 733. . While we do not require that a jury "mirror the demographic composition of the community," *Fields,* 732 P.2d at 1155, it is now axiomatic that the exclusion of persons based on race violates both the federal and state constitutions. *Id.* We have previously held that, among other rights of the accused, the right to an impartial jury has been "constitutionalized not only to protect the innocent from an unjust conviction but, of equal importance, to preserve the integrity of society itself by keeping sound and wholesome the process by which it visits its condemnation on a wrongdoer." *People v. Germany,* 674 P.2d 345, 349 (Colo.1983).

Jury selection and final juror composition have so frequently been the objects of claims based on unfair bias in the administration of justice that it confirms the importance many of our citizens place on jury composition.[2] Thus, when claims of bias arise, we must require the State to be prepared to confront any legitimate concern about the integrity of our judicial process, including the selection of a statewide grand jury. As Justice Thomas noted in *McCollum,* "[t]he public, in general, continues to believe that the makeup of juries can matter." —— U.S. at ——, 112 S.Ct. at 2360. In *McCollum,* the majority reasoned that

1. Under the Colorado Uniform Jury Selection and Service Act, effective January 1, 1990, the General Assembly has continued that policy under new § 13–71–104, which provides:

   **Eligibility for juror service—prohibition of discrimination.** Juror service is a duty which every qualified person shall perform when selected. All trial and grand jurors shall be selected at random from a fair cross section of the population of the area served by the court. All selected and summoned jurors shall serve, except as otherwise provided in this article. No person shall be exempted or excluded from serving as a trial or grand juror because of race, color, religion, sex, national origin, economic status, or occupation. Physically impaired persons shall serve, except where the court finds that such service is not feasible. The court shall strictly enforce the provisions of this article.

2. In his concurrence in *Georgia v. McCollum,* Justice Thomas discusses the disparate ratio of whites to African–Americans in jury panels in "important cases," *McCollum,* —— U.S. at ——, 112 S.Ct. at 2360, and observes that:

   A computer search, for instance, reveals that the phrase "all white jury" has appeared over two hundred times in the past five years in the New York Times, Chicago Tribune, and Los Angeles Times.

[o]ne of the goals of our jury system is "to impress upon ... the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair." *Powers*, 499 U.S. at [——], 111 S.Ct. at 1272. Selection procedures that purposefully exclude African–Americans from juries undermine public confidence—as well they should. "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause."

*McCollum*, —— U.S. at ——–——, 112 S.Ct. at 2353–54 (certain citations omitted).

The need for public confidence in our judicial process and the integrity of the criminal justice system is "essential for preserving community peace." *McCollum*, —— U.S. at ——, 112 S.Ct. at 2353. It is thus of paramount importance that the community believes we guarantee evenhanded entry into our criminal justice system by way of the jury panel, whether grand or petit, and not merely through the jailhouse door. As one commentator suggests, what offends the public's regard for our criminal justice system are vestiges of the "exclusion of minorities from meaningful participation in civic life." Deborah Zalesne and Kinney Zalesne, *Saving The Peremptory Challenge: The Case For A Narrow Interpretation of McCollum*, 70 Den.L.Rev. 313, 336 (1993); *see also*, Barbara Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It Anyway?*, 92 Colum.L.Rev. 725, (1992).

### B.

As noted by the majority, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), outlines the standards "for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause." Maj. op. at 185. *Batson* first requires a defendant to make out a prima facie showing that the State deliberately excluded possible jurors because of race. Once the defendant makes a prima facie showing, the burden then shifts to the State to come forward with reasons for the exclusion that are unrelated to race and that are reasonable under the circumstances of the particular case. *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–1723.

In seeking to rebut the defendant's prima facie showing, the State may not merely deny that it had a discriminatory motive, nor may it simply assert that the individual selections were made in "good faith." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 (*citing Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1971)). Moreover, in articulating its basis for the exclusion, the State "must give a 'clear and reasonably specific' explanation of [its] 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (*citing Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)). These requirements derive from the Court's observation that if mere *"general assertions* were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause would be but a vain and illusory requirement." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 (*quoting Norris v. Alabama*, 294 U.S. 587, 598, 55 S.Ct. 579, 584, 79 L.Ed. 1074 (1935)) (emphasis added). As the final step in evaluating claims of racial discrimination in jury selection, *Batson* requires that once the State·proffers a race-neutral explanation for excluding jurors, the trial court must weigh the evidence to determine if the defendant has established "purposeful discrimination." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724.

### II.

In the case before us, the majority concedes that the defendants established a prima facie case of purposeful racial discrimination in the selection of the venire. Maj. op. at 189. Thus, the burden shifted to the State to clearly and specifically articulate a race-neutral, relevant explanation for its actions, one that consisted of more than mere generalizations about the State's "good faith" actions in selecting the grand jury.

In resolving the question as to whether the State met its burden, the majority re-

lies on *Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion), because that case purportedly "shed[s] additional light on what it means for the State to offer a 'race-neutral explanation.'" Maj. op. at 190. In *Hernandez*, a plurality on the Supreme Court observed that although not conclusive, "disparate impact should be given appropriate weight in determining whether the [State] acted with a forbidden intent," but added that "an explanation based on something other than the race of the juror" may suffice as a race-neutral exegesis for the exclusion. *Hernandez*, —— U.S. at —— – ——, 111 S.Ct. at 1866–67. There, the plurality approved the reasons offered by the prosecution for its peremptory challenges of "Latino potential jurors" [3] because the prosecutor personally testified as to his reasons for the peremptory strikes and "explain[ed] that the specific responses and the demeanor of the two [challenged] individuals during *voir dire* caused him to doubt their ability to defer to the official translation of Spanish-language testimony." *Id.* at ——, 111 S.Ct. at 1867. The rationale for the prosecution's race-neutral explanation was the State's interest in obtaining a single uniform interpretation of trial testimony. The plurality accepted the prosecution's explanation as "clear and reasonably specific," and thus found that this rationale was a *sufficiently specific* race-neutral explanation for the peremptory strikes and that, under the circumstances of that particular case, the explanation was reasonable. *Id.* at ——, 111 S.Ct. at 1868.

The facts of *Hernandez*, however, are distinguishable from the case before us,

given that the prosecutor, i.e., the selecting official, personally testified. In the case before us, the State did not call as a witness the statutory selecting official. Here, the selecting official of the statewide grand jury is the chief judge,[4] and as the selecting official, by our statute, the chief judge is solely responsible for the selection of the statewide grand jury. Under the principle established in *Hernandez*, it was thus incumbent on the State to proffer testimonial or other competent evidence from the chief judge that could establish a "clear and reasonably specific" reason for excluding Spanish-surnamed persons, one that was unrelated to race and reasonable under the circumstances of this case.[5] Unfortunately, the evidence adduced at the hearing did not include *any* testimony whatsoever from the chief judge.

A far more useful case for analogy purposes is *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), also cited by the majority. In *Castaneda*, the defendant, Rodrigo Partida, filed a petition for habeas corpus in the federal district court, alleging a denial of due process and equal protection because of gross under-representation of Mexican–Americans on state grand juries. After a hearing, the federal district court observed that Partida had made out only a "bare prima facie case" of invidious discrimination. The trial court concluded that Partida's prima facie case was rebutted by the State and dismissed his petition for relief. *Id.* at 491, 97 S.Ct. at 1278. On appeal, the Fifth Circuit reversed on the grounds that the State had failed to rebut Partida's showing, and thus held that "[i]n light of the State's abdica-

---

3. The Court deferred to the "terminology preferred by the parties before the Court," *Hernandez*, —— U.S. at ——, 111 S.Ct. at 1864, as I have elected to do here.

4. Section 13–73–103, 6A C.R.S. (1987) prescribes the process for empaneling the state grand jury and states that "[t]he members of the state grand jury *shall be selected by the chief judge* with the advice of the attorney general...." (Emphasis added.)

5. The majority states that "it is unreasonable to expect that when challenged over one year later with regard to a particular name, [the chief

judge] would be able specifically to recall excluding the prospective juror," and that as such, "it was therefore not incumbent upon the People to produce competent evidence that the chief judge specifically recalled eliminating any of the Spanish-surnamed persons in question." Maj. op. at 192. To my mind, the majority misstates the applicable evidentiary standard. The chief judge need only be able to affirmatively and specifically set out his criteria for excluding the Spanish-surnamed jurors in the 1985–86 grand jury, and would not be required to, in each individual case, "specifically [ ] recall excluding the prospective juror."

tion of its responsibility to introduce controverting evidence, [Partida] was entitled to prevail." *Id.* at 492, 97 S.Ct. at 1279. Upon review, the Supreme Court concluded that the showing made by Partida shifted the burden to the State to dispel the inference of intentional discrimination, and hence the "sole issue" before the Court was whether the State successfully rebutted Partida's prima facie showing of discrimination against Mexican–Americans in the state grand jury selection process. *Id.* at 483–84 and 492, 97 S.Ct. at 1274–75 and 1278.

In its analysis of this issue, the Court undertook a study of the workings of the Texas system of grand jury selection. The Court described the statutorily-mandated process as a "key man system, which relies on jury commissioners to select prospective grand jurors from the community at large." 430 U.S. at 484, 97 S.Ct. at 1275. The Court then examined the evidentiary record and noted that, although a state judge had testified about his appointment of the jury commissioners and the state grand jury selection process, the "jury commissioners themselves, *who were the only ones in a position to explain the apparent substantial under-representation of Mexican–Americans and to provide information on the actual operation of the selection,* were never called." *Id.* at 491, 97 S.Ct. at 1278 (emphasis added). The Court then concluded that absent "some testimony from the grand jury commissioners about the method by which they determined the ... qualification for grand jurors," the State could not successfully rebut Partida's prima facie case of discrimination. The Court's rationale for its holding is particularly apt to our case:

Discriminatory intent *can be rebutted only with evidence in the record about*

the way in which the [grand jury selecting officials] operated and their reasons for doing so. It was the State's burden to supply such evidence, once [Partida] established his prima facie case. The State's failure in this regard leaves unchallenged respondent's proof of purposeful discrimination.

*Id.* at 500, 97 S.Ct. at 1283 (emphasis added). Thus the Court specifically held that because the selecting officials did not personally testify as to the grand jury selection process and its underlying criteria, the State was unable to rebut Partida's prima facie case of racial discrimination in the selection of the grand jury.

In the case before us, the relevant evidence was limited to testimony from Deputy Attorney General Smith, who purportedly "worked closely with Chief Judge Flowers in the selection of the ... state grand juries," maj. op. at 192, and other assistant attorneys general. Smith stated that "he believed that the chief judge made 'an effort ... to affirmatively put people from minority groups on the Grand Jury' and that in other years Chief Judge Flowers selected Spanish-surnamed persons to serve on the state grand jury." *Id.* First Assistant Attorney General Lucero similarly testified that Chief Judge Flowers "was particularly sensitive to have a good cross-section of women, blacks and Hispanics" on the grand jury. Maj. op. at 192 n. 24. Although the majority accepts this testimony as evidence of a race-neutral explanation by the State for excluding Spanish-surnamed persons from the state grand jury,[6] the majority's approbation of such testimony seems to me to be precisely what the *Batson* Court cautioned against when it indicated that the State, in rebutting a defendant's prima facie showing of racial discrimination, may not merely deny that it

---

**6.** The majority states that "while it is true that the People offered no competent evidence of what may have been the chief judge's purely subjective thought processes, it was not essential that they do so in light of the fact that the defendants presented at best only a weak prima facie case based on evidence that the selection process was not random and that the selection process was susceptible to abuse." Maj. op. n. 27 at 193. However, the *strength* of the defendant's prima facie case is not germane once the burden has shifted to the State. The majority

goes on to conclude that "it was not necessarily fatal to the People's case that they did not present evidence that the chief judge himself recalled employing certain general criteria when he screened the questionnaires, or that the chief judge did in his own mind employ such general criteria [ ... but that] the preferred procedure in this case would have been for the chief judge to testify, and in different contexts the People would be expected to produce competent evidence of relevant subjective thought processes." The majority, however, does not provide either

had a discriminatory motive, nor may it assert that the selections were made in "good faith." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. Furthermore, this case is directly on point with *Castaneda:* in that case, as here, the State offered no testimony whatever from the grand jury selecting officials, an evidentiary lapse that the U.S. Supreme Court considered to be fatal to the State's ability to overcome the presumption of invidious racial discrimination in the selection of a state grand jury. Although the testimony of the assistant attorney general may be helpful as to the advice given to the chief judge,[7] it is wholly incompetent as to the actual motive and actions of the chief judge, the sole selecting official of the statewide grand jury.

The majority also accepts the State's explanation that "the venire was 'significantly better educated' than the persons that were in the ... group ... excluded from serving' " as a legitimate race-neutral reason for excluding Spanish-surnamed individuals from the grand jury. Maj. op. at 192. Apart from the fact that I do not accept that a preference for "significantly better educated" persons constitutes a race-neutral explanation for the exclusion, *see Buck v. Green*, 690 F.Supp. 1034 (M.D.Ga.1988) (grand jury selection not racially-neutral where criteria for exclusion is "intelligence and experience"), the State has not shown, nor does the majority address, how it is that being "significantly better educated" is related to the circumstances of serving on the state grand jury, as required for an adequate race-neutral explanation of the exclusion.

### III.

In summary, I do not believe that the Equal Protection Clause of the Constitution is "but a vain and illusory requirement" and I read the line of cases which address the standards for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause to provide clear safeguards against rendering that clause as such. It is far too late in the day

for us to presume that government officials properly and fairly discharge their sworn duties, in lieu of applying the same evidentiary burden to the State that we would the ordinary citizen. I therefore believe that the court of appeals was correct in finding that "the record reveals that the [State] provided no specific explanation of the reasons for excluding the Spanish-surnamed jurors." Furthermore, I believe that the court of appeals applied the proper standard, as articulated in *Batson*, in concluding that, without the testimony of the chief judge, the State's "burden cannot be met by the general assertions of the witnesses from the attorney general's office that there was no discrimination." Accordingly, I dissent from the majority and would affirm the judgment of the court of appeals, without the need to remand for a determination as to any statutory violations.

I am authorized to say that Justice MULLARKEY joins this dissent.

---

its authority or its reasoning for these conclusions, nor does it state in which "contexts the People would be expected to produce" more competent evidence.

7. § 13–73–103, 6A C.R.S. (1987) contemplates that the attorney general may advise the chief judge; however, it cannot be questioned that the selecting authority is the chief judge.