**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**John CERRONE, Defendant–Appellant.**

No. 88CA1319.

Colorado Court of Appeals,
Div. III.

Oct. 21, 1993.

Rehearing Denied Dec. 16, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Catherine P. Adkisson, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Neil MacFarlane, Westminster, for defendant-appellant.

Opinion by Judge MARQUEZ.

This case is before us pursuant to mandate from our supreme court in *People v. Cerrone*, 854 P.2d 178 (Colo.1993), reversing our holding in *People v. Cerrone*, 829 P.2d 468 (Colo. App.1991) that there had been racial discrimination in the selection of the 1985–86 grand jury, and remanding for consideration of issues not addressed in our earlier opinion. Upon such consideration, we affirm the judgment of conviction.

Defendant, John Cerrone, was found guilty by a jury of four counts of violating the Colorado Organized Crime Control Act (COCCA), § 18–17–101, et seq., C.R.S. (1986 Repl.Vol. 8B), and one count of pandering. Such charges arose from indictments issued by a state grand jury sitting in the City and County of Denver.

## I.

### A.

Initially, defendant argues that the trial court should have dismissed the indictment because a state grand jury should not have been impaneled. We do not agree.

Section 13–73–101, C.R.S. (1987 Repl.Vol. 6A), regarding the impaneling of statewide grand juries, provides that:

> When the attorney general deems it to be in the public interest to convene a grand jury which has jurisdiction extending beyond the boundaries of any single county, he may petition the chief judge of any district court for an order in accordance with the provisions of this article. Said chief judge may, for good cause shown, order the impaneling of a state grand jury which shall have statewide jurisdiction. In making his determination as to the need for impaneling a state grand jury, the judge shall require a showing that the matter cannot be effectively handled by a grand jury impaneled pursuant to article 72 of this title, such a grand jury being referred to in this article as a "county grand jury."

On January 28, 1985, the chief judge of the Denver District Court reviewed a verified petition for an order impaneling a statewide grand jury presented by the attorney general. The chief judge found that the attorney general had made a showing of good cause. Specifically, he found that the matters in this case could not be effectively handled by a county grand jury, and it was in the public interest to convene a statewide grand jury. Thus, the impaneling of the statewide grand jury was proper.

### B.

Second, although in its reversal of our earlier holding, our supreme court found no constitutional violation in the selection of the 1985–86 grand jury, defendant has also challenged the grand jury selection on the basis of racial and economic discrimination in violation of Colorado statutory law. We find no statutory violation.

Section 13–71–103, C.R.S. (1987 Repl.Vol. 6A), in effect at the time at issue here, provides:

> A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status.

This provision should be read in the context of the broader legislative policy that is presented in § 13–71–102, C.R.S. (1987 Repl. Vol. 6A) also in effect at the time at issue here. That provision states:

> It is the policy of this state that all persons selected for jury service shall be selected at random from a fair cross section of the population of the area served by the court,

and that all qualified citizens shall have the opportunity in accordance with the provisions of this article to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose.

Some discretion, however, remains in the jury selection process as § 13–73–103, C.R.S. (1987 Repl.Vol. 6A) provides that:

[M]embers of the state grand jury shall be selected by the chief judge with the advice of the attorney general and shall serve for one year following selection unless discharged sooner by the chief judge.

Defendant claimed discrimination based on the fact that no persons with Spanish surnames were on the grand jury and that the government struck from the list of prospective grand jurors persons who appeared to work for an hourly wage.

■ In order to resolve defendant's statutory claims, we must first construe the statutes. The primary goal of statutory construction is to effect the intent of the General Assembly. Section 2–4–212, C.R.S. (1985 Repl.Vol. 1B). Courts should assume the General Assembly intended a just and reasonable result. Section 2–4–201(1)(c), C.R.S. (1980 Repl.Vol. 1B). Also, a statute should be construed to accomplish the purpose for which it was enacted. *Perlmutter v. Blessing,* 706 P.2d 772 (Colo.1985).

■ In ascertaining the legislative purpose, we look first at the statutory language employed by the General Assembly and give words their commonly accepted and understood meaning. *Woodsmall v. Regional Transportation District,* 800 P.2d 63 (Colo. 1990).

Here, § 13–71–102 provides that all qualified citizens shall have the opportunity to be considered for jury service. Section 13–71–103 provides that a citizen "shall not be excluded ... on account of" race or economic status. The latter statute does not explicitly provide that the act of discrimination be intentional or purposeful.

■ However, "on account of" is defined as for the sake of, by reason of, or because of. *Websters 3rd New International Dictio-*

*nary* 13 (1986). In our view, these terms imply affirmative conduct, and we thus conclude that the statute prohibits purposeful exclusion from the jury based on an impermissible factor, *i.e.,* race or economic status cannot be the reason for exclusion. Further, although not specifically required by statute, we conclude that the three-step process utilized by our supreme court in *People v. Cerrone, supra,* for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause is also appropriate here.

Our supreme court noted that defendant had not challenged the manner in which the original pool of 375 prospective jurors was selected. *People v. Cerrone, supra.*

Considering both the factors used to exclude potential jurors and the reasoning behind the use of those factors, our supreme court in *People v. Cerrone, supra,* determined that the People succeeded in offering a race-neutral explanation for the jury selection process.

In denying defendant's constitutional claim, the supreme court also held "that the trial court did not err when it found as a matter of historical fact that the defendants did not sustain their burden of proving purposeful racial discrimination under the Fourteenth Amendment." *People v. Cerrone, supra,* 854 P.2d at 193. We conclude that the supreme court's analysis applies equally well to defendant's statutory claims based on racial discrimination. Thus, those claims are denied.

Defendant's claims based on economic status, however, pose a different question, and our supreme court expressed no opinion with respect to economic status.

The prosecution concedes that testimony established that, since the cases brought before the grand jury were often complicated and highly technical, those involved in the selection process looked for potential candidates who were better educated and had some sort of specialized training or experience in accounting, finance, or medicine. They also sought persons who would be able to attend the meetings approximately one day per week for 40 weeks.

■ The deputy attorney general admitted that being an hourly wage earner was one factor, among several, that goes to the question of creating a substantial hardship on a grand juror. The deputy attorney general explained that the purpose of applying this factor was to impanel a jury that could consistently attend each Friday throughout the lengthy grand jury session. Based on experience, the attorney general had determined that hourly wage earners were more likely to claim an economic hardship in sitting on the grand jury even though they might not so indicate on the initial juror questionnaire. *See* § 13–71–112(2), C.R.S. (1987 Repl.Vol. 6A) (court, on its own initiative, may excuse juror for undue hardship); *People v. Reese*, 670 P.2d 11 (Colo.App.1983) (what constitutes undue hardship lies with the discretion of the trial court and includes one for whom jury service would impose an undue financial burden).

Based on these facts, the trial court determined that: "By making a deliberate attempt to get certain kinds of people on the jury, the result was that persons of lower income may not have been included." The court found, however, that the criteria used were racially and economically neutral and that: "[T]here was no deliberate effort to exclude persons on the basis of their economic status." We affirm because the evidence was sufficient to support these findings.

The trial court did not, however, discuss whether being an hourly wage earner equated to having a certain economic status and, if so, whether that made the status of being an hourly wage earner an impermissible factor to use in deciding which jurors should be excused. As the trial court noted, "the problem of economic status and what economic status means under our statute has never been clearly articulated." We hold that, under the circumstances here, there was no violation of the statute. As long as the reasons for excluding are of an economically neutral character, the use of hourly wage earner status as one factor in trying to impanel grand jurors who would consistently attend the scheduled sessions during the year was not error.

## C.

■ Defendant next contends that the indictment should have been dismissed because of violations of Crim.P. 6.2 requiring that grand jury proceedings be secret and because there were unauthorized persons in the grand jury room in violation of Crim.P. 6.5.

However, these violations, if any, were not shown to have affected substantial rights of defendant. *See* Crim.P. 52(a). In fact, the petit jury's subsequent guilty verdict made these alleged errors in the grand jury proceeding harmless beyond a reasonable doubt. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986).

## II.

Defendant also contends that he was denied his right to a speedy trial guaranteed by § 18–1–405, C.R.S. (1986 Repl.Vol. 8B). We disagree.

Section 18–1–405(1), C.R.S. (1986 Repl.Vol. 8B) provides that:

Except as otherwise provided in this section, if a defendant is not brought to trial on the issues raised by the complaint, information, or indictment within six months from the date of the entry of a plea of not guilty ... the pending charges shall be dismissed....

An exception to this general rule is found in § 18–1–405(3), C.R.S. (1986 Repl.Vol. 8B), which states that:

If a trial date has been fixed by the court, and thereafter the defendant requests and is granted a continuance for trial, the period within which the trial shall be had is extended for an additional six months' period from the date upon which the continuance was granted.

Here, defendant initially waived his right to a speedy trial. He then was arraigned and pled not guilty on July 2, 1987. The court subsequently set defendant's trial date for January 4, 1988. This date was the last day of the mandated six-month speedy trial period.

On November 24, 1987, because the State Public Defender would not pay fees in excess of the guidelines issued by the Colorado Supreme Court, defendant's court-appointed attorney was allowed to withdraw. Defendant did not object to the withdrawal and did not voice any concerns about speedy trial. Further, after advisement by the court, defendant waived any potential conflict and indicated that he wanted the public defender's office appointed to represent him. The trial court then ordered the State Public Defender to provide an attorney to represent defendant.

An attorney was not appointed to represent defendant until December 10, 1987. At that time defendant's newly appointed counsel requested a continuance to enable him to prepare for trial. Defendant objected to the request, and no ruling was made.

Four days later at the next proceeding, defendant's newly appointed counsel advised the court that defendant did not want the attorney to represent him because of a possible conflict with other attorneys in the public defender's office. The court ruled that defendant could not change his position and that it appeared that defendant was trying to use the situation to his tactical advantage. Because defendant was at that time unwilling to waive any potential conflict in the public defender's office, his newly appointed counsel was allowed to withdraw. The Public Defender remained under continuing orders to provide counsel for defendant but was unable to provide him a lawyer who would be prepared to go to trial on January 4th.

The court questioned defendant regarding the speedy trial situation at that time. The exchange reflects defendant's understanding of the problem of obtaining competent counsel for a January 4th trial date and his desire to proceed to trial as scheduled.

On December 29th, defendant was again questioned by the court. Defendant was asked whether he wanted to go to trial on January 4th and represent himself or whether he wanted competent counsel. He stated that he needed and wanted an attorney. He further stated that: "If you want to put it at a different date, like I said before, a different later date, you can, but I'm not waiving speedy trial." Subsequently, on February 2, 1988, new counsel was appointed to represent defendant, and a new trial date was set.

In April 1988, defendant's motion to dismiss for denial of speedy trial was denied. In ruling on this motion the trial court found that defendant's "desire for competent counsel impliedly and necessarily waived his right to speedy trial. Any delay is attributable to the defendant, caused by the withdrawal of his counsel."

■ If the continuance caused by the substitution of counsel was chargeable to defendant, then the trial court was correct in extending the speedy trial deadline. *People v. Scales*, 763 P.2d 1045 (Colo.1988). "In order for a continuance to be chargeable to a defendant, it must have been caused by an affirmative act of the defendant, or by the defendant's express consent to the continuance, or by other affirmative action evincing consent by the defendant." *People v. Scales, supra* at 1047–48. This determination is essentially an *ad hoc* inquiry.

Here, defendant neither caused the continuance by affirmative act nor expressly consented to the continuance. Thus, for the delay to be charged to defendant, he must have engaged in some "other affirmative action evincing consent."

In *People v. Lewis*, 739 P.2d 861 (Colo. App.1987), a similar chain of events took place. Over the defendant's objection, the trial court disqualified defendant's attorney for an ethical conflict not attributable to defendant. The defendant's newly appointed counsel then requested a continuance in order to prepare for trial. In denying the defendant's speedy trial claim, a panel of this court stated:

The record shows that the trial court counseled the defendant at length as to his new attorney's request for a continuance, and that the defendant understood and agreed with the need for a continuance. The fact that the continuance was ultimately occasioned by a ruling of the trial court disqualifying the defendant's attorneys does

not change the result under § 18–1–405(3), C.R.S. (1986 Repl.Vol. 8B).

*People v. Lewis, supra,* 739 P.2d at 862.

Here, defendant was also counseled at length by the trial court and appeared to understand the need for a continuance. Under these circumstances, we cannot say that the trial court clearly abused its discretion by allowing defense counsel to withdraw or that the result was unjust. *See People v. Scales, supra; People v. Schultheis,* 638 P.2d 8 (Colo.1981).

■ Furthermore, § 18–1–405 was intended to prevent unnecessary prosecutorial and judicial delays. *People v. Runningbear,* 753 P.2d 764, 767 (Colo.1988). In this case, neither the prosecutor nor the judiciary was responsible for the delay. Moreover, the speedy trial provisions should not be applied in "a wooden or mechanistic fashion," and the countervailing interest in effective enforcement of criminal laws must also be considered. *People v. Sanchez,* 649 P.2d 1049, 1052 (Colo.1982).

For these reasons, the ruling of the trial court was correct and defendant was not denied his right to a speedy trial.

### III.

Defendant further argues that the COCCA count alleging that he invested proceeds received from a racketeering activity in the establishment and operation of an enterprise should have been dismissed. We disagree.

Section 18–17–104(1)(a), C.R.S. (1986 Repl. Vol. 8B) of COCCA provides that:

It is unlawful for any *person* who has received any proceeds derived, directly or indirectly, from a pattern of racketeering activity, ... to use or invest, whether directly or indirectly, any part of such proceeds or the proceeds derived from the investment or use thereof ... in the establishment or operation of any *enterprise.* (emphasis added)

"Enterprise" is defined to mean:

[A]ny individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, *or group of individuals,* associated in fact

although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities. Section 18–17–103(2), C.R.S. (1986 Repl. Vol. 8B) (emphasis added).

Defendant argues that he does not fit within the definition of enterprise and that the enterprise must be separate and distinct from the pattern of racketeering activity alleged.

The indictment defined the "enterprise" as "a group of individuals, to wit: John Cerrone and Emily Cerrone." More on point, the alleged prostitution ring qualifies as "a group of individuals associated in fact although not a legal entity."

■ Also, the enterprise need not be separate and distinct from the racketeering activity. *See United States v. McLaurin,* 557 F.2d 1064 (5th Cir.1977) *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978) (prostitution ring). Enterprise is defined to include "illicit as well as licit enterprises." Section 18–17–103(2), C.R.S. (1986 Repl.Vol. 8B).

■ We also reject defendant's contention that he cannot be both the "person" and the "enterprise" defined in the statute. Section 18–17–104(1)(a) is modeled on 18 U.S.C. § 1962(a) (1988), which does not require that the "enterprise" and "person" engaged in racketeering activity be different entities. *See Petro–Tech, Inc. v. Western Co.,* 824 F.2d 1349 (3d Cir.1987). *Cf. Ferris v. Bakery, Confectionery & Tobacco Union, Local 26,* 867 P.2d 38 (Colo.App.1993) (a different result under § 18–17–104(3), C.R.S. (1986 Repl. Vol. 8B)).

### IV.

Defendant next argues that the trial court erred in not properly instructing the jury on every element of the offense of pandering. Again, we perceive no reversible error.

Section 18–7–203(1)(b), C.R.S. (1986 Repl. Vol. 8B) provides that a person, who for money or other thing of value "[k]nowingly arrange[s] or offer[s] to arrange a situation in which a person *may* practice prostitution," commits the crime of pandering. (emphasis

added) This is essentially how the jury was instructed. *See COLJI–Crim.* 24.04 (1983).

▮ Relying on *People v. Hoehl,* 193 Colo. 557, 568 P.2d 484 (1977), and the "notes on use" for the pandering instruction set out in *COLJI–Crim. 24.04* (1983), defendant contends that the court should have further defined "may" to mean "reasonable probability." However, because defendant failed to object to the instruction at trial, it is valid unless an actual defect constituted "plain error." Crim.P. 52(a).

▮ Under the plain error standard, we must determine whether defendant's substantial rights were seriously affected. In our view, any error arising from a failure to give the requested definitional instruction did not meet this standard so as to require reversal.

### V.

Last, defendant contends that the jury's finding that he was guilty of the predicate offense of pimping was not supported by the evidence. We disagree.

Section 18–7–206, C.R.S. (1986 Repl.Vol. 8B) defines pimping as follows:

> Any person who knowingly lives on or is supported or maintained in whole or in part by money or other thing of value earned, received, procured, or realized by any other person through prostitution commits pimping, which is a class 3 felony.

▮ Defendant argues that he only received money for "room rent," not from any acts of prostitution. Defendant stated that he would receive this money regardless of whether the women received any tips, monies, or other things of value for any acts of prostitution. Thus, defendant concludes that he did not live on money earned "through prostitution."

The jury found that defendant was guilty of pimping at three different locations. All three were businesses where nude "body rubs" were offered to customers in connection with a session in a hot tub with a nude female employee.

There was evidence presented that the businesses were given 30% of the money the women received for acts of prostitution and that defendant had full knowledge of how each business operated. This evidence is sufficient to establish that defendant was guilty of pimping. *See People v. Ganatta,* 638 P.2d 268 (Colo.1981); *People v. Barron,* 195 Colo. 390, 578 P.2d 649 (1978).

▮ Furthermore, even if defendant merely received money for use of the rooms, and not from any prostitution activity that occurred in the rooms, the evidence is still sufficient to find defendant guilty of pimping. Looking at the evidence in the light most favorable to the prosecution, we find it to be sufficient to establish that the purpose of the business was to allow prostitution to occur and that defendant knew about and encouraged the prostitution. Thus, the jury could properly infer that defendant lived off money earned through prostitution. *See People v. Stage,* 195 Colo. 110, 575 P.2d 423 (1978).

Because we do not have jurisdiction, we do not address the issue of the constitutionality of § 18–7–203 or § 18–7–206. *See* § 13–4–102(1)(b), C.R.S. (1987 Repl.Vol. 6A). *Cf.* § 13–4–102(1)(b), C.R.S. (1993 Cum.Supp.) (effective July 1, 1992).

Judgment affirmed.

STERNBERG, C.J., concurs.

TURSI, J., dissents.

Judge TURSI dissenting.

Because the selection of the grand jury in this matter violates the statutory rights of the defendant and the statutory and constitutional rights of the citizenry, I respectfully dissent.

In *People v. Cerrone,* 854 P.2d 178, 181 (Colo.1993), the court adopted these findings of the trial court:

> [D]uring the course of selecting the 1985–86 grand jury, *deliberate attempts* were made to select persons with college educations or occupations that would help them to understand complicated cases that were to be presented that year to the grand jury and that *deliberate attempts* were also made to select persons whose jobs and family commitments would allow

them most easily to be away from work or home nearly every Friday for one year when the grand jury met. (emphasis supplied)

After holding in a split decision that the procedure followed did not violate defendant's equal protection right under the federal constitution, the supreme court then reversed and remanded for our ruling on whether the procedure followed in selecting the grand jury violated § 13–71–103, C.R.S. (1987 Repl.Vol. 6A) because of the systematic exclusions based on levels of formal education and status as an hourly wage earner. *See People v. Cerrone, supra*, fn. 3.

Section 13–71–103, provides:

A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin, or economic status.

And, § 13–71–102, C.R.S. (1987 Repl.Vol. 6A) provides:

It is the policy of this state that all persons selected for jury service shall be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens shall have the opportunity in accordance with the provisions of this article to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose.

Hence, since the State of Colorado has expressly extended to its citizens the opportunities and obligations to serve on juries beyond those specifically contained in the United States, Colorado Constitutions, the supreme court's remand was not only proper, but necessary. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (Right of the citizenry to serve on juries without discrimination). *Cf. Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

In *Cerrone, supra*, the court adopted the three-part standard from *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) for purposes of determining the existence of discrimination in jury selection. That standard, as applicable here, is:

(1) The defendant is required first to make a prima facie showing that the State has excluded potential jurors on account of [education or economic status]. (2) If the requisite showing has been made, the burden shifts to the State to articulate a ... neutral explanation for excluding the jurors in question. (3) If the State succeeds in articulating a ... neutral explanation, then the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Here, that defendant has established the first prong of the *Batson* test is irrefutable.

Although the People have articulated a neutral explanation for excluding potential jurors on an educational and economic basis under the second prong, that explanation does not, in my estimation, rise to a *successful* articulation of a neutral exclusion. However, even if I assume that the explanation is sufficient to carry the matter to the third prong, it is undisputed that the People purposefully and deliberately discriminated against that large and probably majority segment of the population with limited formal education and hourly wage earner economic status.

Clearly, the People cannot rely upon a neutral reason for the utilization of exclusions which patently deprives the public and this defendant of jurors selected at random from a fair cross section of the population. *See* § 13–17–102 & 103.

There is no evidence in the record to establish that education and intelligence are necessarily coextensive nor is there evidence that an hourly wage earner would be less attentive. Thus, though the People have proffered a purported neutral explanation, that explanation is irreconcilable with the specific provisions of the statutes and which purposefully discriminatory.

Hence, I would hold that the deliberate selection of an elitist grand jury violates the relevant statutes and the public policy of the State of Colorado and would, therefore, reverse the conviction of defendant.